E-FILED
Monday, 10 August, 2026 02:12:11 PM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### ROCK ISLAND DIVISION

STEPHANIE RUSK,

    *Plaintiff,*

v.

                     Case No. 4:25-cv-04076-SLD-RLH

HENRY COUNTY, ILLINOIS,

    *Defendant.*

## ORDER & OPINION

The Court previously denied Rusk's motion to compel, finding that the discovery withheld by the County was protected by the attorney-client privilege. Rusk objected to that ruling, and her objection was sustained. Since then, the County has produced the disputed discovery—emails, documents, and audio—to the Court for in camera review. For the reasons explained below, Rusk's motion to compel, (Doc. 21), is GRANTED in part and DENIED in part. Her second motion to strike and to compel, (Doc. 32), is DENIED as procedurally improper, though she will be granted leave to renew it at the appropriate time.

## BACKGROUND

The relevant background information has been set forth in detail in the Court's previous orders. (*See* Docs. 23, 29.) The Court thus confines its discussion to the disputed discovery.[1]

---

[1] The Court's first order asserted that "Rusk's motion seeks to compel two categories of documents." (Doc. 23 at 2.) That was inaccurate. In fact, Rusk sought to compel *three* categories of documents, and the undersigned has been instructed to address each category separately. (Doc. 29 at 5–7.)

The first category consists of three emails exchanged on January 13, 2025 among three people: Steven Martell, the County's Behavioral Health Manager; Naomi Stahl, its HR director; and Duane Stevens, its Public Health Administrator (the "January 13 emails"). (*See* Doc. 21-1 at 1–3.) The email chain initiated with a communication from Martell to Stahl and Stevens at 11:29 a.m. In it, Martel informed the two recipients that he had created a chart comparing the credentials of two County employees—Rusk and Malissa Sanders. The next email, sent by Stahl, asked Martel to supplement his chart with additional information pertaining to the employees' performance. And the third email, again from Martel, stated that he had supplemented the chart, per Stahl's request. It also stated that Martel had attached a separate "document of concerns" that he had compiled over the past several months.

The second category consists of two documents: Martel's comparison chart and the list of concerns about Rusk that he had fielded from various sources (the "January 13 documents"). The chart is approximately half a page long, and it lists Rusk's and Sanders's respective qualifications, along with two complaints that had been lodged against Rusk. The document of concerns is much longer—spanning over three pages. It sets forth sixteen dates between August 2024 and December 2024; under each date is one or more bullet points that detail various patient complaints and interoffice communications.

The third category consists an audio recording from the County Health Board's closed session on November 5, 2025. The closed session was held after this lawsuit was filed, while discovery was ongoing. The board members are provided an update

about the litigation timeline, and they pose various questions to the meeting's host about the litigation, possibility of depositions, and the like.

## LEGAL STANDARD

This case presents a federal question, so federal privilege law applies. *See* Fed. R. Evid. 501. The attorney-client privilege protects communications made in confidence by a client to an attorney for the purpose of securing legal advice. *Sandra T.E. v. S. Berwyn Sch. Dist. 100*, 600 F.3d 612, 618 (7th Cir. 2010). As that definition suggests, the privilege generally protects only communications authored or received by an attorney. *See Gerba v. Nat'l Hellenic Museum*, 338 F. Supp. 3d 851, 858 (N.D. Ill. 2018). This makes sense: Its purpose is to encourage the "candor necessary to obtain legal advice," *In re Feldberg*, 862 F.2d 622, 627 (7th Cir. 1988), and such advice is generally communicated by attorneys to their clients. But when it comes to corporations and other legal entities, the limitation makes less sense. After all, corporations can only act (and think) through their agents. *Consumer Fin. Protection Bureau v. TransUnion*, 641 F. Supp. 3d 474, 483 (N.D. Ill. 2022). The privilege thus extends to communications among non-attorney employees when they reflect an attorney's "legal thinking and forward-looking strategy." *In re Testosterone Replacement Therapy Prods. Liab. Litig. (TRT)*, 301 F. Supp. 3d 917, 923 (N.D. Ill. 2018). Extending the privilege in this way affords organizations "the space to collectively discuss sensitive information" without risking waiver. *Roth v. Aon Corp.*, 254 F.R.D. 538, 542 (N.D. Ill. 2009).

3

## DISCUSSION

Rusk moves to compel production of the January 13 emails, the January 13 documents, and the November 5 audio recording. Each category is addressed below.

## I.    The January 13 Emails

The Court's in camera review of the January 13 emails shows that they are not privileged. No attorney is a party to the communications, nor do any of the emails even mention the County's attorney. In fact, the emails disclose nothing more than two employees discussing the need to gather basic facts about an employee who was being terminated (Rusk) and an employee who was not (Sanders).

The Court's previous order denying Rusk's motion to compel rested on the assumption that the emails reflect the County attorney's "legal thinking," *TRT*, 301 F. Supp. 3d at 923, and "'relat[e] to legal advice regarding' the County's termination of Rusk while she was on FMLA leave," (Doc. 23 at 3 (quoting *In re Sulfuric Acid Antitrust Litig. (Sulfuric)*, 235 F.R.D. 407, 433 (N.D. Ill. 2006))). But the emails themselves dispel that assumption. Indeed, they do not say whether the County's attorney has requested the information, nor do they mention the County's attorney at all. And even if they did, the January 13 emails don't indicate *why* the County's lawyer requested the documents, what the County's lawyer intends on doing with them, or how the County's lawyer believes the information sought fits into the County's defense. Even assuming that the January 13 emails "discuss information requested by the County's attorney," (Doc. 22 at 4), they do not reveal the lawyer's

legal thinking, her forward looking strategy, or anything else. *See TRT,* 302 F. Supp. 3d at 923; *Sulfuric,* 235 F.R.D. at 433.[2]

The January 13 emails must be disclosed.

## II.    The January 13 Documents

The January 13 documents must be disclosed for similar reasons. It is settled that the attorney-client privilege protects "communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney." *Kodish v. Oakbrook Terrace First Protection Dist.*, 235 F.R.D. 447, 452 (7th Cir. 2006). That is enough to resolve this category. The January 13 documents reveal nothing more than (1) a timeline of events that took place before Rusk's termination and (2) a side-by-side comparison of Rusk's and Sanders's credentials. Although Martell may have, at some point, "communicated with" the County's attorney, *id.*, "documents do not become cloaked with the lawyer-client privilege merely by the fact of their being passed from a client to lawyer." *United States v. Robinson*, 121 F.3d 971, 974 (5th Cir. 1997). It follows that a document does not become privileged merely because the document's creator spoke with an attorney. *See In re Walsh*, 623 F.2d 489, 494 (7th Cir. 1980) (the privilege "does not create a cloak of protection which is draped around all occurrences and conversations which have any bearing, direct or indirect, upon the relationship of the attorney with his client" (quotations omitted)).

Perhaps the best evidence of the factual nature of the January 13 documents is the County's own description of them: Martell told Stahl that he "wanted to make

---

[2] In its response, the County did not argue that the attorney work-product doctrine applied to the January 13 emails. So the Court does not address whether the emails are protected on that ground.

sure [the chart] stayed objective"; Stahl responded that they "need to stay objective and factual." And a look at the documents shows they achieved that goal. The "document of concerns" contains bare factual information about certain events leading up to Rusk's termination; the chart similarly contains facts about Rusk and Sanders. As with the January 13 emails, nothing in these documents would reveal the County's lawyer's legal thinking or forward-looking strategy. *See TRT*, 302 F. Supp. 3d at 923; *Sulfuric*, 235 F.R.D. at 433. That these documents may have been solicited by or ultimately sent to the County's lawyer is thus irrelevant because they do not reveal confidential communications. *See Sandra T.E.*, 600 F.3d at 618.

Nor does the attorney work-product doctrine supply an alternative basis to withhold the January 13 documents. That doctrine protects material "prepared in anticipation of litigation" by a party or its representative. Fed. R. Civ. P. 26(b)(3)(A). In opposing Rusk's motion to compel, the County argued that the documents—though created by County employees—were crucial to "counsel's investigation into the legal risks" of terminating Rusk and "to assist with providing" legal advice to the County. (Doc. 22 at 11.)

True, the doctrine shields documents created not only by an attorney but also by the client—and thus, by implication, the client's employees. *See Caremark, Inc. v. Affiliated Computer Servs., Inc.*, 195 F.R.D. 610, 615 (N.D. Ill. 2000) (doctrine extends to materials prepared "by any representative of the client regardless of whether the representative is acting for the lawyer"). Here, that would be Martell (he created the January 13 documents). But the County has not met its burden to demonstrate that

6

the January 13 documents were "*caused by* the anticipation of litigation." *Allendale Mut. Ins. Co. v. Bull Data Sys., Inc.*, 145 F.R.D. 84, 87 (N.D. Ill. 1992). To do so, the County must adduce "objective facts" to establish that, when the January 13 documents were created, Rusk possessed an "identifiable resolve to litigate." *Id.* It has not. The County has produced nothing to show that in early January 2025 (when the chart was created), it was facing a "significant threat" of a lawsuit from Rusk. *Id.* And the "document of concerns" falls even shorter of this standard: Martell, by his own admission, began compiling the list in August 2024—well before the County terminated Rusk.

The County insists that the documents were created as part of a broader investigation into "the strengths and weaknesses of the legal risks" involved in terminating Rusk. (Doc. 22 at 11.) Maybe so. But the work-product doctrine does not sweep so broadly. It does not protect "factual information accumulated" in the course of "routine investigations." *Allendale*, 145 F.R.D. at 87. The January 13 documents disclose factual information; they were created not in the face of an impending lawsuit, but instead during the kind of internal investigation that often takes place when an organization thinks about firing one of its employees. Of course, personnel decisions often involve "legal risks." (Doc. 22 at 11.) But "litigation can be anticipated at the time almost any incident occurs." *Id.* So the work-product doctrine applies only to material created in the face of "a substantial and significant threat of litigation." *Id.* The County's investigation into Rusk's history and the legal risks associated with terminating her falls short of that standard.

7

The January 13 documents must be disclosed.

### III.    The November 5 Audio Recording

Finally, Rusk seeks the audio recording of the November 5, 2025 closed session of the County Health Board. In its previous order, the Court observed that the November 5 meeting was convened for the sole purpose of discussing this case. It also observed that "during the meeting, County officials discussed information related to them by the County's attorney 'earlier that same day.'" (Doc. 23 at 5 (quoting Doc. 22 at 13).) Because the earlier conversation with the attorney was undoubtedly privileged, the Court reasoned, sharing it with County officials did not result in a waiver. (Doc. 23 at 5–6.)

That was wrong. The audio recording itself undermines an important premise of the Court's analysis: that the discussion at the November 5 meeting actually revealed any legal advice provided to the County by its attorney. (*See* Doc. 23 at 6.) Indeed, the vast majority of what was discussed during the meeting was case deadlines and background information. At one point, a board member asked what the County's labor attorney thought about the lawsuit; but the only responsive given was non-substantive. So the one question that *would have* elicited confidential attorney-client communications was not answered. True, the board was told that the case remains in the discovery stage, that the County's attorney has requested information both from the County and from Rusk, and that the board members may be deposed. But the mere *fact* that the County's attorney has requested documents is, of course, not privileged information. Those participating in the November 5 closed session did

not discuss what documents have been requested or how the County's lawyer believes they support Rusk's claims or the County defense. Nor are routine scheduling matters—like the discovery deadline and trial date—privileged: that information is publicly available, as is the record of most lawsuits in federal court. Accordingly, the November 5 audio recording is not protected by the attorney-client privilege.

The County also invoked the Illinois Open Meetings Act—a state-law privilege that shields the record of closed meetings from disclosure in judicial proceedings. 5 ILCS 120/2.06(e). But this is federal court, Rusk has brought a federal claim, and federal privilege law applies. *See* Fed. R. Evid. 501. Federal courts nonetheless "recognize state privileges" when doing so would not undermine "federal substantive and procedural policy." *Mem. Hosp. for McHenry Cnty. v. Shadur*, 664 F.2d 1058, 1061 (7th Cir. 1981). To make that determination, courts balance "the need for truth" against the importance of whatever policy the state privilege seeks to achieve. *Id.* Applying this test to the Open Meetings Act in particular, courts ask *how important* the information discussed in the meeting is to the plaintiff's claim. In *Kodish v. Oakbrook Terrace Fire Protection District*, for instance, the court refused to apply the privilege to a closed meeting because, during the meeting, the defendants discussed—and ultimately decided on—the plaintiff's termination. 235 F.R.D. 447, 452 (N.D. Ill. 2006). It thus provided insight into the defendants' "motive and basis" for terminating the plaintiff—a central element of his § 1983 claim. *Id.* In *Sandholm v. Dixon Public School District No. 170*, by contrast, the court sustained the privilege because the

9

closed meeting was "of little relevance to" the plaintiff's claims. No. 9-cv-5119, 2010 WL 899032, at *2 (N.D. Ill. Mar. 10, 2010).

This case falls somewhere in between *Kodish* and *Sandholm*. Like *Kodish*, the County board's discussion of this suit also provides some insight into the County's motives for firing Rusk. It is therefore relevant to her FMLA claims. Unlike *Kodish*, however, the November 5 meeting was not where the County ultimately decided to terminate Rusk; it was held long after this lawsuit was filed. And like *Sandholm*, much of the discussion at the November 5 meeting is completely irrelevant. Disclosure of those portions would not advance the resolution of this case—that is where Illinois's policy of protecting closed meetings takes over. After careful review of the audio recording, the Court finds that the following excerpts must be disclosed: 00:00–2:53; 3:50–5:55; and 7:28–9:00. These portions of the meetings are the only ones that could conceivably bare on the County's "motive and basis" for terminating Rusk. *Kodish*, 235 F.R.D. at 452. The remainder of the discussion concerns logistical and background case information not relevant to Rusk's claims, so it need not be disclosed.[3]

## IV.    Rusk's Motions to Strike & Compel

After the Court conducted an in camera review of the documents discussed above, Rusk filed a motion (1) to strike certain ex parte submissions, and (2) to compel their disclosure. (Doc. 32.) For context, the order sustaining Rusk's objections

---

[3] Rusk's motion to compel also sought leave to file a motion for sanctions under Fed. R. Civ. P. 37. The Court will reserve ruling on such a request. Should Rusk believe that sanctions are warranted in light of the Court's ruling, she may renew her request for sanctions via a proper motion.

observed that courts often consider a variety of surrounding circumstances to resolve attorney-client privilege disputes of this kind. (*See* Doc. 29 at 9–10.) One of them is the relationship—if any—between the attorney and the employees. To that end, the County submitted for in camera review *separate* email threads between the County's attorney and its employees—generated on October 28, 2024, November 12, 2024, and January 2, 2025. The County explained that these emails may "provide clarity on the relationship between the County and its counsel."

Rusk characterizes these emails as "unlogged" and "undisclosed" "pre-decisional documents" that the County has been "secretly withholding" throughout this litigation. (Doc. 32 at 2.) She thus asks the Court to "strike the unrequested documents from any consideration on the Motion to Compel." (Doc. 32 at 4.) But that request is unnecessary: The Court did not consider those documents in the analysis set forth above. That is because, *regardless* of the relationship between the County and its counsel, the January 13 emails and documents are not attorney-client privileged, for the reasons already given. Rusk's request to "strike" those documents from the Court's consideration is accordingly moot.

Second, Rusk maintains that the "County has waived any privilege claim over the documents produced to the Court" and that their production to Rusk should therefore be compelled. (Doc. 32 at 14.) The County vigorously contests that assertion and responds that it was not required to log those documents because they were never requested. (*See* Doc. 33 at 1–2.) The Court need not resolve the issue, however, because Rusk's request is premature. Indeed, Rule 37(a) requires that any motion to

11

compel "include a certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make the disclosure." And to implement that directive, the undersigned's standing order requires that parties undergo an informal dispute resolution process before filing any motion to compel.[4]

Rusk's most recent motion to compel concerns an entirely different set of documents that were generated under different circumstances than the January 13 emails, the January 13 documents, or the November 5 closed session. Both Rule 37 and the undersigned's standing order therefore required her to attempt to confer with the County in good faith before resort to motion practice. Yet Rusk has failed to certify that she had done so. Accordingly, her motion to compel will be denied. Should Rusk wish to pursue disclosure of the separate emails, she must follow the procedures outlined above.

---

[4] *See* Hon. Ronald L. Hanna, *Civil Standing Order* § VI (effective Oct. 28, 2025), https://www.ilcd.uscourts.gov/sites/ilcd/files/local_rules/Hanna%20Standing%20Order%20Oct.%2020 25%20V.2.pdf.

## CONCLUSION

IT IS THEREFORE ORDERED that Rusk's Motion to Compel, (Doc. 21), is GRANTED in part and DENIED in part. The County is ORDERED to disclose the January 13 emails, the January 13 documents, and the specified portions of the November 5 audio recording. IT IS FURTHER ORDERED that Rusk's Motion to Strike and Motion to Compel, (Doc. 32), is DENIED with leave to renew. Rusk's Motion for Leave to File a Reply, (Doc. 34), is therefore MOOT.

*So ordered.*

Entered this 10th day of August 2026.

s/ Ronald L. Hanna
Ronald L. Hanna
United States Magistrate Judge

13